O

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

| | |
|---|---|
| JACOB PETERSEN et al., | Case No.: SA CV 13-1292-DOC (JCGx) |
|      Plaintiffs, | |
|      vs. | **ORDER RE: MOTION FOR SUMMARY JUDGMENT [236]** |
| COSTCO WHOLESALE CO., INC. et al. | |
|      Defendants. | |

Before the Court is the Defendants' Motion for Summary Judgment ("Motion") (Dkt. 236).

## I.      Background

This lawsuit is a consumer class action brought by Plaintiffs Jacob Petersen, Gayle Prather,[1] Suzanne Faber, Andrea Medrano,[2] Leslie Lee, David Troutman,[3] Thomas Fiore, Leslie Straka, Aerol Paden, and Amy Paden[4] (collectively, "Plaintiffs") against Defendants Costco Wholesale Co., Inc, ("Costco"), Townsend Farms, Inc. ("Townsend"), Fallon Trading Co., Inc. ("Fallon"), and United Juice Corp ("United Juice") (collectively, "Defendants"). Plaintiffs allege injury as a result of the risk of exposure to the hepatitis A virus after consuming Townsend Farms Organic Anti-Oxidant Blend, a frozen berry and pomegranate aril[5] mix ("berry mix") purchased at Costco. *See generally* Fourth Amended Complaint ("4AC") (Dkt. 241).

Hepatitis A is a viral liver disease that can cause mild to severe illness. *Hepatitis A*, World Health Organization, http://www.who.int/mediacentre/factsheets/fs328/en/ (last visited January 6, 2017) ("WHO, Hepatitis A"). Although people who contract hepatitis A typically make a full recovery, the disease can cause acute liver failure and, in rare cases, death. *Id.* It is primarily spread when an uninfected person ingests food or water that is contaminated with the feces of an infected person. *Id.*

### A. Facts

In late May of 2013, the federal government informed Costco and Townsend that the pomegranate arils in the Townsend berry mix sold by Costco were likely contaminated with hepatitis A and responsible for an outbreak of the disease. Plaintiffs' Corrected Statement of Genuine Disputes of Material Fact (Plaintiffs' CSGD) (Dkt. 239) Nos. 1, 4. Those arils had been processed by Goknur, the parent company of Defendant United Juice Corporation. *Id.* No. 2. Plaintiffs assert that Fallon was responsible for importing, distributing, and/or selling those

---

[1] Gayle Prather replaced Chris Mason, a former named plaintiff who has now been excluded from the class definition.
[2] Andrea Medrano replaced Motoko and Jenabe Caldwell, who have both become too infirm to act.
[3] David Troutman replaced Anthony McConaghy, who has passed away.
[4] Aerol and Amy Paden replaced Jay and Frances Sewards as the class representatives for Washington class members after it came to light that the Sewards's claims would likely be governed by California law.
[5] Arils are the seed pods of a pomegranate.

pomegranate arils. *See* 4AC ¶ 35. The berry mix containing the lot of potentially contaminated pomegranate arils had been on the market since January 2013. *Id.* No. 3.

Costco then initiated a voluntary recall of more than 400,000 packages of the berry mix and offered a refund for the berry mix. *Id.* Nos. 5, 26. The incubation period for hepatitis A is typically two to four weeks, and there is a vaccine for hepatitis A that can be effective if taken within a window of two weeks after exposure to the virus. WHO, Hepatitis A. Accordingly, Costco instructed consumers to visit their health care providers or the local health department to obtain hepatitis A vaccine shots. Costco offered free hepatitis A vaccine shots and offered to reimburse people for vaccines they received elsewhere. *Id.* No 7. In the face of the possibility of contracting a life threatening illness, class members moved quickly to get vaccinated before the disease manifested.

Defendants sent letters and called Costco members to inform the members of the recall. *Id.* No. 4. One such letter read, in part,

> Please return any remaining Townsend Farms Anti-[O]xidant Blend to your Costco for a full refund.
>
> If you have eaten the product in the last 10 days the CDC & FDA advice is to visit your personal health care provider or your local health department to receive a Hepatitis A vaccination.

Declaration of Daniel S. Trimmer (Trimmer Decl.) (Dkt. 236-2) Ex. 19. Another letter informed consumers that the berry mix was potentially infected with the hepatitis A virus and stated that

> [i]f you have, or may have consumed the Organic Antioxidant Blend you should:
>
> - Contact your health care professional or the local health department immediately to determine if a vaccination is appropriate.
> - If you have consumed the product within the past 14 days, get the vaccination.

- If you still have the product in your refrigerator or freezer you should not consume it. The product should be disposed of or returned to Costco immediately.
- Simply return the product with your club card to Costco for a full refund.

*Id.* Ex. 21.

Some class members chose to get free hepatitis A vaccines from Costco. Any person who got an immunization from Costco was required to sign an "Immunization Consent Form" ("Form"). Trimmer Decl. Ex. 20 Declaration of Shelly Sefton and Immunization Consent Form. In relevant part, the Form reads:

I have read the adverse reactions associated with the administration of vaccines. A copy of the vaccine manufacturer's drug information sheet is available on request. Furthermore, I have also had an opportunity to ask questions about these immunizations. I believe the benefits outweigh the risks and I voluntarily assume full responsibility for any reactions that may result from . . . my receipt of the immunization(s) . . . I am requesting that the immunization(s) be given to me or my Ward. I, for myself and on behalf of my Ward, and each of our respective heirs, executors, personal representatives, and assigns, hereby release Costco, and its affiliates, subsidiaries, divisions, directors, contractors, agents and employees (collectively "Released Parties"), from any and all claims arising out of, in connection with or in any way related to my receipt and the receipt by my Ward of this or these immunization(s). Neither Costco nor any of the Released Parties shall, at any time or to any extent whatsoever, be liable, responsible or any way accountable for any loss, injury, death or damage suffered or sustained by any person at any time in connection with or as a result of this vaccine program or the administration of the vaccines described above.

*Id.*

Ultimately, the CDC identified 165 persons who contracted hepatitis A after consuming contaminated berry mix. Plaintiffs' CSGD No. 11. Sixty-nine people where hospitalized, and one required a liver transplant. Trimmer Decl. Ex. 14 at 5. This certified class excludes individuals who contracted hepatitis A. *Id.* No. 10.

**B. Procedural History**

Plaintiffs originally filed this lawsuit on June 3, 2013 in Orange County Superior Court. Notice of Removal (Dkt. 1) Ex. A. The case was removed to federal court on August 22, 2013. *Id.* Plaintiffs filed the operative complaint, the Fourth Amended Complaint, on December 1, 2016. In that complaint, Plaintiffs assert claims for strict liability, negligence, and breach of warranties against various Defendants. *See generally* 4AC.

On July 27, 2015, Plaintiffs proposed the following class for certification:

> All residents of Arizona, California, Colorado, Idaho, Hawaii, Nevada, New Mexico, Oregon, or Washington who: (1) consumed the recalled product—that is, Townsend Farms Organic Anti-Oxidant Blend frozen berry-mix purchased at Costco and subject to the recall that was announced in press releases that the Townsend Farms issued on June 4 and 28, 2013, and (2) received preventive medical treatment, including an injection of hepatitis-A vaccine or immune globulin, blood tests, and other associated costs.

Memorandum in Support of Motion to Certify Class (Dkt. 134) at 3. On January 25, 2016, the Court certified the class "insofar as [Plaintiffs seek] to certify nine single-state subclasses for the purposes of determining liability" as to strict liability. Order Re: Motion for Class Certification ("Class Cert. Order") (Dkt. 181) at 27.

The Court initially struck Defendants' Summary Judgment Motion after it was filed almost a month late. October 26, 2016 Order (Dkt. 226). However, the Court ultimately allowed Defendants to bring a motion for summary judgment. *See* November 10, 2016 Order (Dkt. 234). Defendants Costco, Fallon, and Townsend then filed their Motion for Summary

Judgment ("Motion") (Dkt. 236) on November 21, 2016. On November 22, 2016, United Juice joined in the Motion (Dkt 237). On November 28, Plaintiffs opposed (Dkt. 238), and Defendants replied on December 5, 2016. Upon the order of the Court, Plaintiffs filed an Amended Opposition (Dkt. 249), which was compliant with the Local Rules.

## II.    Legal Standard

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is to be granted cautiously, with due respect for a party's right to have its factually grounded claims and defenses tried to a jury. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1992); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial, but it need not disprove the other party's case. *Celotex*, 477 U.S. at 323. When the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out that the non-moving party has failed to present any genuine issue of material fact as to an essential element of its case. *See Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990).

Once the moving party meets its burden, the burden shifts to the opposing party to set out specific material facts showing a genuine issue for trial. *See Liberty Lobby*, 477 U.S. at 248–49. A "material fact" is one which "might affect the outcome of the suit under the governing law . . . ." *Id.* at 248. A party cannot create a genuine issue of material fact simply by making assertions in its legal papers. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1982). Rather, there must be specific, admissible evidence identifying the basis for the dispute. *Id.* The court need not "comb the record" looking for other evidence; it is only required to consider evidence set forth in the moving and opposing papers and the portions of the record cited therein. Fed. R. Civ. P. 56(c)(3); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001). The Supreme

Court has held that "[t]he mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for [the opposing party]." *Liberty Lobby*, 477 U.S. at 252.

## III. Discussion

Defendants argue for summary judgment on four grounds: (1) Plaintiffs cannot demonstrate the berry mix was defective, (2) multiple Plaintiffs cannot establish their claimed damages, (3) multiple Plaintiffs cannot make out a claim for emotional distress damages, and (4) the consent forms signed by people who received shots from Costco preclude those individuals' recovery. The Court will first address Defendants' defect argument, then tackle the damages issues, and conclude by analyzing the impact of the Immunization Consent Forms.

### A. Defective Product

Defendants' first argument for summary judgment is that Plaintiffs cannot demonstrate any defect in the berry mix. According to Defendants, there can be no proof of defect because Plaintiffs cannot show that any individual Plaintiff consumed berry mix that Plaintiffs can conclusively prove was infected with hepatitis A. Mot. at 7–8.

"A bedrock principle in strict liability law requires that the plaintiff's injury must have been caused by a 'defect' in the defendant's product." *O'Neil v. Crane Co.*, 53 Cal. 4th 335, 347 (2012) (internal citations and alterations omitted); *see, e.g.*, *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1150–51 (9th Cir. 2005) (finding that to demonstrate strict liability under Nevada law, a plaintiff must demonstrate that their injury was caused by a defect in a defendant's product); *D'Agnese v. Novartis Pharm. Corp.*, 952 F. Supp. 2d 880, 889 (D. Ariz. 2013) ("To establish a prima facie case of products liability, at a minimum, the plaintiff must show that the product is in a defective condition . . . and the defective condition is the proximate cause of the plaintiff's injury." (internal citations omitted)). For purposes of this motion, it appears that the parties generally agree on this chief feature of strict liability law. *See* Am. Opp'n at 2, 6–12.

Defendants and Plaintiffs part ways, however, on the issue of what constitutes a defect. Defendants argue that to prove a defect, Plaintiffs must demonstrate that each Plaintiff ate berry

mix that was actually contaminated with hepatitis A and thus each Plaintiff was actually exposed to hepatitis A. Mot. at 9–10. Plaintiffs disagree and counter that the berry mix was defective because, anyone who ate the berries urgently needed to obtain a hepatitis A vaccination. Am. Opp'n at 1.

Defendants assert that Plaintiffs' theory of defect is tantamount to asking the Court to find that a recall alone demonstrates defect in the recalled products. *See* Mot. at 9. Defendants argue that case law forecloses this holding, citing *Ruiz Food Prods., Inc. v. Catlin Underwriting U.S., Inc.*, 2012 WL 4050001 (E.D. Cal., Sept. 13, 2012); *In re ConAgra Peanut Butter Products Liability Litigation*, 251 F.R.D. 689 (N.D. Ga. 2008); and *Khan v. Shiley Inc.*, 217 Cal. App. 3d 848 (Cal. App. Ct. 1990). The Court considers these cases in turn.

The Court questions Defendants' choice to cite *Ruiz* with nothing more than a parenthetical quotation to explain its relevance. *Ruiz* was not a strict liability case. Instead, *Ruiz* dealt with what qualified as "contamination" under an "accidental contamination policy." *See Ruiz*, 2012 WL 4050001 at *6. The *Ruiz* court addressed the scope of the specific language of the relevant insurance contract, and never addressed strict liability. *Id.* at *7–*10. The Court, therefore, does not find this case sheds light on what constitutes a defect in the products liability context.

At least on its face, *In re ConAgra* appears relevant. There, hundreds of people got sick after being exposed to salmonella bacteria in the defendant's peanut butter. *In re ConAgra*, 251 F.R.D. at 691. The Food and Drug Administration issued a national warning and recalled hundreds of thousands of jars of peanut butter. *Id.* Post-recall testing suggested that fewer than two percent of the recalled jars had traces of salmonella. *Id.* The plaintiffs asked the court to certify two classes: one asserting unjust enrichment claims made up of persons who purchased the recalled peanut butter, and another class made up of persons who "consumed ConAgra peanut butter and who assert or allege claims sounding in personal injury therefrom." *Id.* at 691–92 (internal quotation marks omitted). In evaluating the superiority requirement of Rule 23, as to the unjust enrichment claims, the court rejected the notion that anyone who had their peanut butter recalled was entitled to recover, noting that many people ate all or some of the

peanut butter with no ill effect. *Id.* at 699. Further, the court found that "the governing law requires individual proof of damages." *Id.*

Defendants additionally cite *Khan* for the proposition that a recall alone does not create liability. The *Khan* plaintiffs were a married couple. *Khan*, 217 Cal. App. 3d at 851. The wife had a valve implanted into her heart to replace a diseased mitral valve. *Id.* at 850. The valve was subsequently recalled after its manufacturer discovered that the valve had a propensity to fracture, with fatal results. *Id.* at 851. The wife's doctor advised against replacing the valve in her chest because the risks of a second open heart surgery were greater than the risks of leaving the recalled valve in place. *Id.* She and her husband brought various claims against the manufacturer, including a strict products liability action for the emotional distress they suffered as a result of knowing that her heart valve might shatter. *Id.* at 851–52. They were not alleging any injuries arising from additional medical care.

The *Kahn* court noted that a defendant is strictly liable for its products only when "an article it places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being." *Id.* at 855 (citing *Greenman v. Yuba Power Prod., Inc.*, 377 P.2d 897, 900 (1963)) (internal alternations omitted). The plaintiffs argued that there was no need to show a product had malfunctioned in order to recover under strict liability law. *Id.* at 854. The court disagreed and determined that the "essential element of causation [was] missing . . . ." *Id.*

In light of these decisions, the Court does not disagree with Defendants that the mere fact of a recall is insufficient to render a defendant liable under a theory of strict products liability to everyone who purchased a recalled product. But, the Plaintiffs are not asserting that a recall creates strict products liability, and are instead advancing a more nuanced argument. The thrust of Plaintiff's argument is that the berry mix was defective because it was unfit for human food. *See* Am. Opp'n at 2–3, 24–27.

Plaintiffs make two cogent points in support of this argument. First, no one would choose to purchase or consume the berry mix, or serve the berry mix to their familes, in the face of the warning that the berries were potentially contaminated with hepatitis A. *Id.* at 2–3; *see*

*also Ontai v. Straub Clinic & Hosp. Inc.*, 66 Haw. 237, 241 (1983) ("It is enough that the plaintiff demonstrates that because of its manufacture or design, the product does not meet the reasonable expectations of the ordinary consumer or user as to its safety."). Nor does the Court expect Costco, or any other retailer, would put into the marketplace a berry mix knowing that some people who ate the berries would be exposed to hepatitis A. *See also Barker v. Lull En'g Co.*, 20 Cal. 3d 413, 429 (1978) ("[A] defective product is one that differs from the manufacturer's intended result . . . .").

Second, Plaintiffs point out that it is not difficult to imagine that if someone received the warning letter urging them to "get the vaccination," and then decided a vaccination was not worth the hassle, a defendant might argue that person had assumed the risk of contracting hepatitis A, or failed to mitigate their own damages resulting from exposure to the defective product. *Id.* at 3. Plaintiffs are right that no one purchases berries expecting that they will need to get a vaccine or run the risk of contracting hepatitis A. Further, a Defendant sent a letter specifically stating that the berry mix should not be consumed, and directing anyone who had potentially eaten the berry mix in the previous fourteen days to obtain a vaccine. *See* Trimmer Decl. Ex. 21. The Court agrees with Plaintiffs that a food item that the manufacturer has deemed unfit for consumption and requires consumers to urgently obtain a vaccination is defective.

When considering this defect, it is important to also consider the harm that Plaintiffs may have suffered, as Plaintiffs must demonstrate that the defect caused a harm. Here the alleged harm is the requirement to obtain medical attention and an emergency vaccination. The chain of causation is this: (1) someone eats the berry mix; (2) the person needs to get a vaccine for hepatitis A because the berry mix was unfit for human consumption; and (3) the person incurs the costs, inconvenience, and pain associated with obtaining a hepatitis A vaccine.

This rule has limited applications. Granted, one could argue that any food product that was potentially contaminated with a pathogen would, under this definition, be defective. However, in most cases of food contamination there is little to be done once the possibly contaminated food has been consumed. A person must often wait to see if she develops an

illness or not. If she does, she can sue for the personal injury arising out of the infection. If she does not, she has no products liability claim against the manufacturer. However, this is because there is no harm arising out of the defect—the consumer was not sickened and sustained no economic or physical injury as a result of consuming the defective product. The facts here are different though, in that one can take a vaccine before symptoms of hepatitis A manifest, but after infection, to avoid contracting the illness. Of course, any rational person faced with the choice between potentially contracting hepatitis A and getting a vaccine would get the vaccine, assuming no special personal circumstances. Therefore, in this situation, a consumer exposed to the defective berries must bear the costs and burdens of obtaining a vaccine in a timely fashion, where in other situations this might not be true.

Bearing these definitions of defect and harm in mind, the present case is distinct from *In re ConAgra* and *Khan*. In the former case, the parties were bringing unjust enrichment claims and personal injury claims, arguing they had been infected with salmonella. *See in re ConAgra*, 251 F.R.D. at 691. In order to determine whether there was unjust enrichment, the court would have had to conduct an individualized inquiry into whether the plaintiffs had eaten all or some of their peanut butter to ascertain whether a plaintiff got only part of the value of their purchase. *See id.* at 699. An individualized inquiry was also necessary to determine whether someone had actually contracted salmonella. *See id.* Here, however, the damages are not in question, as the class is limited to persons who were forced to get vaccines.

In *Khan*, the plaintiffs did not allege a malfunction and there was no showing of causation. *See Khan*, 217 Cal. App. 3d at 851–52. Here, Plaintiffs have presented evidence that the manufacturer considered the berry mix unfit for consumption, and have provided a viable theory of harm. *Khan* is also distinguishable because the plaintiff was not required to take preventative measures to protect herself from fracture, as her doctor advised against another operation to replace or reinforce the valve. *See id.* at 851. Here, by contrast, Plaintiffs needed to quickly take a vaccine to protect themselves from the defect in the berries. [6]

---

[6] The Court has been unable to locate a strict liability case addressing a situation where a food was recalled due to a potential contamination and there was a curative direction to obtain a vaccination shot.

Defendants warn that the rule outlined above will discourage recalls. Mot. at 11. In making this argument, Defendants are essentially predicting that corporations will gamble with their customers' health to avoid paying for the costs of preventative care. The Court is unpersuaded. There are many factors that influence the decision to issue a recall, including preserving a company's reputation, potential liability resulting from harm to persons who contract a disease, and consumer safety. The Court expects that reputational, liability, and safety concerns will outweigh worries about the costs of providing preventative medical care to persons who consume a product that was not fit for consumption.

Further, under the logic of Defendants' argument, a company who recalled a food contaminated with a pathogen would be disappointed to discover there was a post-exposure vaccine that could prevent disease from taking root. The Court finds this argument wanting, charitably stated. The Court is confident that Defendants would agree they were fortunate that there is a post-exposure vaccine for hepatitis A. Indeed, the fact that there is a post-exposure vaccine to hepatitis A may well have reduced Defendants' liability by preventing persons exposed to the pathogen from contracting the virus. Although not a common complication, a person who contracts hepatitis A may need a liver transplant as a result of the disease. Plaintiffs have received awards in the millions of dollars if a defendant's conduct forces or may force them to obtain a liver transplant. *See Seth Cook v. Baxter Healthcare Corp.*, 02 Idaho Verd. Stlmnts. 6-3 (2002) (awarding a plaintiff $2,725,000 because he might at a future date require a liver transplant because he contracted the hepatitis C virus from the defendant's product). In the event a person has complications from a liver transplant, damages can be even higher. *See James Rivers Insurance Company v. Laura DiMauro*, 2009 WL 4731136 (2009) (awarding $5 million in damages to a plaintiff based on the follow-up care she required stemming from complications from a liver transplant).

Finally, to the extent policy considerations are relevant, the Court finds that they weigh in favor of this construction of strict liability. Strict liability law exists in part because consumers cannot investigate every link in a supply chain before they purchase a product and are not typically qualified to asses for themselves whether a product is defective. *See Greenman*

*v. Yuba Power Prod., Inc.*, 59 Cal. 2d 57, 63 (1963) (noting consumers are "powerless to protect themselves"). Strict lability law instead shifts the burden to corporations to ensure that the products they provide to consumers are safe. This ruling is in line with that policy.

For the reasons explained above, the Court finds that at a minimum a factual dispute exists over whether there was a defect present in the berry mix.

### B. Inability to Prove Damages

Defendants next contend that the claims of many of the named Plaintiffs must be dismissed because those Plaintiffs have failed to show any damages, or cannot recover emotional distress damages. Defendants make two global points in support of this argument.

Defendants argue that Plaintiffs cannot demonstrate a physical injury. Mot. at 13–14. Defendants point out that a California Court of Appeal has stated that "[i]n a routine needle stick, harm, if it occurs, takes place when a hazardous foreign substance, introduced to the body through the needle, causes detrimental change to the body." *See Macy's California, Inc. v. Superior Court*, 41 Cal. App. 4th 744, 756 (1995). However, that court made that observation in the context of a negligent infliction of emotional distress fear of disease claim, where the plaintiff sought to recover for her fear of contracting AIDS. *See id.* The Court is not prepared to find, as a matter of law, that unwanted medical care in the form of a needle stick can never constitute a personal injury. Accordingly, there is a triable issue of fact as to whether there is physical harm associated with being forced to receive a shot. Therefore, the Court will not grant summary judgment to the Defendants on the grounds that there was no physical harm to Plaintiffs.

Second, Defendants assert that Plaintiffs cannot demonstrate actual exposure to hepatitis A, as required to make a fear of disease claim. Mot. at 14. In their complaint, Plaintiffs request "non-economic damages, in a sum certain amount, for the emotional distress, anxiety, and related reasonable fear of HAV infection for the limited period between learning of [the] need to take the recommended, medically-reasonably steps to avoid infection." 4AC ¶ 63. Although this sentence could be clearer, the Court understands the Plaintiffs to be asserting a fear of disease claim there. However, Plaintiffs now state that they are "not asserting fear of disease

claims," and acknowledge that fear of disease claims are generally barred absent proof of actual exposure to a pathogen. *See* Plaintiffs' CSGD at ¶ 9. Plaintiffs have in numerous instances conceded they cannot show exposure to hepatitis A. *See, e.g.*, Am. Opp'n at 2 ("If evidence of actual contamination is required, then there can be no recovery . . ."). Accordingly, to the extent Plaintiffs have asserted a claim for emotional distress due to fear of disease, summary judgment is GRANTED IN PART as to those claims.

### C. Waiver

Defendants conclude by arguing that anyone who received a free shot from Costco and signed the Immunization Consent Form waived their claims—including Nevada class representative Fiore. Mot. at 24.

The "waiver" portion of the Form reads:

> I have read the adverse reactions associated with the administration of vaccines. A copy of the vaccine manufacturer's drug information sheet is available on request. Furthermore, I have also had an opportunity to ask questions about these immunizations. I believe the benefits outweigh the risks and I voluntarily assume full responsibility for any reactions that may result from . . . my receipt of the immunization(s) . . . I am requesting that the immunization(s) be given to me or my Ward. I, for myself and on behalf of my Ward, and each of our respective heirs, executors, personal representatives, and assigns, hereby release Costco, and its affiliates, subsidiaries, divisions, directors, contractors, agents and employees (collectively "Released Parties"), from any and all claims arising out of, in connection with or in any way related to my receipt and the receipt by my Ward of this or these immunization(s). Neither Costco nor any of the Released Parties shall, at any time or to any extent whatsoever, be liable, responsible or any way accountable for any loss, injury, death or damage suffered or sustained by any person at any time in connection with or as a

1    result of this vaccine program or the administration of the vaccines

2    described above.

3 Trimmer Decl. Ex. 20, Immunization Consent Form.

4        At least in Nevada, exculpatory clauses are generally valid.[7] *Contreras v. Am. Family*

5 *Mut. Ins. Co.*, 135 F. Supp. 3d 1208, 1229 (D. Nev. 2015). However, "contracts providing for

6 immunity from liability for negligence must be construed strictly since they are not favorite of

7 the law." *Id.* (citing *Agricultural Aviation Eng. Co. v. Bd. of Clark Cnty. Comm'rs*, 794 P.2d

8 710, 712–13 (1990)). Further, the contract must particularly "spell out" the parties' intention

9 and demonstrate "intent to release from liability beyond doubt." *Id.* (citing *Agricultural*

10 *Aviation*, 794 P.2d at 712–13). Exculpatory clauses are to be "construed with every intendment

11 against" the party seeking to avoid liability. *Id.* (citing *Agricultural Aviation*, 794 P.2d at 712–

12 13). The party seeking to establish their immunity bears the burden of demonstrating that the

13 contract exculpates them. *Id.* (citing *Agricultural Aviation*, 794 P.2d at 712–13).

14        The Form states that the signee waives liability "arising out of, in connection with or in

15 any way related to my receipt and the receipt by my Ward of this or these immunization(s)."

16 Trimmer Decl. Ex. 20, Immunization Consent Form. But, the Form makes no special reference

17 to contaminated berries, nor to releasing Costco and the other "Released Parties" from liability

18 arising out of the consumption of the defective berries. Particularly in light of the preceding

19 phrases, which review the medical risks associated with a vaccine, *see id.*, the release could

20 well be understood simply as a typical vaccine release that protects the vaccine provider from

21 liability if a person has an unanticipated adverse reaction. Indeed, this conclusion is supported

22 by the fact that this Form was given to anyone receiving any vaccine at Costco. Trimmer Decl.

23 Ex. 20 Sefton Declaration ¶ 6. Therefore, this Form was not tailored to this situation, nor

24 intended to insulate Costco from strict liability claims for outbreaks of pathogens in its food.

25 Accordingly, construing the contract strictly and with every intendment against Costco, the

26 Court finds that the Form does not constitute a waiver of liability for claims arising out of the

27 consumption of the defective berry mix. *See Contreras*, 135 F. Supp. 3d at 1229.

28
---
[7] Defendants rely on Nevada law to make their argument, and do not suggest that law of any other state diverges from
Nevada law. *See* Mot. at 24. The Court will, therefore, address only Nevada law.

Additionally, the Court has concerns that even if the Form contained an exculpatory clause, it would be unconscionable under Nevada law. *See Bill Stremmel Motors, Inc. v. IDS Leasing Corp.*, 89 Nev. 414, 418 (1973) (stating a contract is unconscionable "when the clauses of that contract and the circumstances existing at the time of the execution of the contract are so one-sided as to oppress or unfairly surprise an innocent party."). Here, Costco was providing disease preventing care under circumstances where Plaintiffs had a ticking clock to get treatment—strongly indicating that Plaintiffs were oppressed at the time they signed the Forms.[8] However, the Court need not reach this issue as it finds the Form inadequate to create an exculpatory clause as to these claims.

## IV.   Disposition

Summary judgment is GRANTED IN PART. Summary judgment is GRANTED as to any claims for emotional distress due to fear of disease. Otherwise, summary judgment is DENIED.

At the hearing, the parties represented to the Court that they needed a continuance of the dates in this matter to have time to properly prepare for trial. The Court ORDERS the parties to submit a new proposed schedule on or before **January 23, 2017**.[9]

DATED:  January 17, 2017

_David O. Carter_
_____
DAVID O. CARTER
UNITED STATES DISTRICT JUDGE

---

[8] Further, the Court notes that even if the Form contained a valid exculpatory clause, the clause might be void on public policy grounds in California. *See Tunkl v. Regents of Univ. of Cal.*, 60 Cal. 2d 92 (1963).
[9] Ideally this would take the form of a stipulation to new dates, but if the parties cannot agree on the dates, they may submit competing proposed schedules with justifications for the divergences.